GREG W. MARSH
Nevada Bar No. 000322
**LAW OFFICES OF GREG W. MARSH**
731 South Seventh Street
Las Vegas, Nevada  89101
Telephone:   702.387.0052
Facsimile:   702.387.0063
Email:       Dmr4253@aol.com

PAUL G. CEREGHINI
Nevada Bar No. 010000
BRYAN J. BLEHM
Nevada Bar No. 009975
**BOWMAN AND BROOKE LLP**
2901 North Central Avenue, Suite 1600
Phoenix, Arizona  85012
Telephone:   602.643.2300
Facsimile:   602.248.0947
Email:       paul.cereghini@bowmanandbrooke.com
             bryan.blehm@bowmanandbrooke.com

**Attorneys for Hyundai Motor America**

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CHRISTINE KEYES, | CASE NO: 2:08-CV-00736-LRH-LRL |
| Plaintiff, | **HYUNDAI MOTOR AMERICA'S MOTION TO DISMISS FOR SPOLIATION OF EVIDENCE AND DISCOVERY FRAUD AND FOR SUMMARY JUDGMENT** |
| v. | |
| HYUNDAI MOTOR AMERICA, a foreign corporation; DOES I through X; and ROE CORPORATIONS I through X inclusive, | |
| Defendants. | |

Defendant HYUNDAI MOTOR AMERICA (HMA) hereby moves this Court to dismiss plaintiff's Amended Complaint because plaintiff failed to preserve the car that is the subject of this product liability claim, concealed evidence, and committed perjury at her deposition. In the alternative, HMA moves this Court for summary judgment pursuant to Fed. R. Civ. P. 56.  This motion should be granted because:

      1.    Plaintiff has failed to produce evidence to establish a defect in the subject

1        vehicle that caused or contributed to plaintiff's injuries.

2        2.      There is no longer any way for plaintiff to establish by technical inspection of

3                the subject vehicle that the alleged defects existed or caused her injury.

4        3.      HMA cannot inspect the subject vehicle to test the validity or establish the

5                falsehood of plaintiff's claims.

6        4.      The jury will be unable to evaluate key facts that would have been available

7                had the subject vehicle not been spoliated by plaintiff.

8        5.      Plaintiff's discovery fraud is aimed at denying HMA a full and fair opportunity

9                to obtain and evaluate critical evidence.

10       This Motion is based on the pleadings and papers on file herein, the following

11  Memorandum of Points and Authorities and any oral argument the Court may entertain.

12       DATED this 6th day of May, 2009.

13                                                  **BOWMAN AND BROOKE LLP**

14

15                                         By:___/s/ Bryan J. Blehm_____
                                           Paul G. Cereghini (Nevada Bar No. 010000)
16                                         Bryan Blehm (Nevada Bar No. 009975)
                                           2901 North Central Avenue, Ste. 1600
17                                         Phoenix, Arizona  85012
                                           paul.cereghini@bowmanandbrooke.com
18                                         bryan.blehm@bowmanandbrooke.com

19                                             In conjunction with:

20                                         Greg W. Marsh (Nevada Bar No. 000322)
                                           **LAW OFFICES OF GREG W. MARSH**
21                                         731 South Seventh Street
                                           Las Vegas, Nevada  89101
22                                         (702) 387-0052
                                           Dmr4253@aol.com

23                                         Attorneys for Defendant Hyundai Motor America

24

25

26

27

28

1

## TABLE OF CONTENTS

2    I.    TABLE OF AUTHORITIES ...................................................................5

3
4    II.   INTRODUCTION ...............................................................................6

5          A.    THE SUBJECT ACCIDENT ...........................................................6

6          B.    PRE-LITIGATION HISTORY .........................................................8

7          C.    LITIGATION HISTORY ...............................................................9

8
9    III.  LEGAL ANALYSIS .........................................................................11

10         A.    DISMISSAL IS WARRANTED WHERE PLAINTIFF OR HER AGENTS DISPOSED
                 OF EVIDENCE THAT IS THE SUBJECT OF THIS LITIGATION AND ENGAGED
11               IN DISCOVERY FRAUD. ............................................................11

12         B.    THE SPOLIATION OF THE SUBJECT VEHICLE AND PLAINTIFF'S WILLFUL
                 DISCOVERY FRAUD DEMAND DISMISSAL OF THIS ACTION. ...................17
13
14               1.    Dismissal Is Appropriate Because Plaintiff's Agents
                       Willfully Destroyed The Accent. ......................................17

15
16               2.    HMA Would Be Unfairly Prejudiced By Any Sanction
                       Other Than Dismissal Of This Action With Prejudice.................18

17                     a.    Because the Accent has been destroyed, HMA is
                             denied the opportunity to assess how preexisting
18                           frontal impact damage impacted its performance............19

19                     b.    Because the Accent has been destroyed, HMA is
                             denied the opportunity to inspect damage patterns
20                           and how the airbag and seat belt performed during
21                           the accident........................................................20

22               3.    Dismissal Is the Appropriate Sanction For A Plaintiff
                       Who Has Spoliated Evidence And Engaged In Discovery
23                     Fraud To Stymie HMA's Defenses And Enhance Her
                       Claims.................................................................24
24
25                     a.    To enhance her damages claim, plaintiff concealed
                             evidence and committed perjury about a
26                           substantial pre-existing medical history. .........................25

27                     b.    To enhance her liability claim, plaintiff concealed
                             preexisting damage to the subject vehicle.......................32
28

*c.* *To enhance her damages claim, plaintiff refused to provide documentary evidence supporting her lost income claim and committed perjury about her pre-accident employment and income.* ..............................33

*d.* *To enhance her damages claim, plaintiff committed perjury about her education history.* ...............35

*e.* *To enhance her damages claim, plaintiff committed perjury regarding post-accident participation in medically recommended rehabilitation.* ........................................................36

*f.* *To enhance her liability claim, plaintiff committed perjury regarding her weight at the time of the accident.* ................................................................37

*g.* *To enhance her damages claim, plaintiff committed perjury regarding pre-accident illicit and prescription drug use.* ..................................39

*h.* *To enhance her damages claim, plaintiff attempted to conceal and committed perjury about her past litigation history involving personal injury lawsuits.* ..............................................................40

4. **Dismissal Is Appropriate Because Plaintiff's Spoliation Resulted In The Irreparable Loss Of Dispositive Evidence.** .......................................................................42

5. **Dismissal Is Appropriate Because Plaintiff's Spoliation And Discovery Fraud Prevent A Fair Adjudication Of This Matter On The Merits.** ...............................................43

6. **Dismissal Does Not Unfairly Operate To Penalize Plaintiff For The Spoliation Of Her Agents And Her Own Discovery Fraud.** ...................................................................44

7. **Dismissal Is The Only Remedy That Will Deter Future Litigants From Engaging In Similar Conduct.** ...........................44

C. SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THE PLAINTIFF HAS DISPOSED OF EVIDENCE NECESSARY TO PROVE HER CASE. ...........................45

IV. **CONCLUSION** .......................................................................48

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    TABLE OF AUTHORITIES**

3

**Cases**

4

Celotex Corp. v. Catrett, 466 U.S. 317 (1986)…………………………………………………45

5

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)……………………………………….45

6

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986)………………45

7

Nevada Power Co. v. Fluor Illinois, 837 P.2d 1354 (Nev. 1992)…………………………….11

8

Stubli v. Big D Int'l Trucks, Inc., 810 P.2d 785, 788 (Nev. 1991)………………11-13, 24, 44

9

Young v. Johnny Ribeiro Bldg., 787 P.2d 777, 780 (Nev. 1990)……………………11, 13-14

10

Fire Ins. Exch. v. Zenith Radio Corp., 747 P.2d 911, 914 (Nev. 1987)……………………..11

11

Temora Trading Co., Ltd. v. Perry, 645 P.2d 436, cert. denied, 459 U.S. 1070
(Nev. 1982)……………………………………………………………………………………..14

12

Havas v. Bank of Nevada, 613 P.2d 706 (Nev. 1980)………………………………………..14

13

Kelly Broad. Co., Inc. v. Sovereign Broad., Inc., 606 P.2d 1089, 1092 (Nev. 1980)…..14-15

14

Baker v. Myers Tractor Services, Inc., 756 S.2d 149, 150 (Fla. 1st DCA 2000)…...15-16, 25

15

Cox v. Burke, 706 S.2d 43, 47 (Fla. 5th DCA 1998)………………………………………...16

16

Ralston v. Casanova, 473 N.E. 2d 444, 448 (Ill. App. 1984)…………………………………11

17

**Rules**

18

Fed. R. Civ. P. 56……………………………………………………………………………..45

19

**Nevada Jury Instructions**

20

NJI 7.02……………………………………………………………………………………….46

21

22

23

24

25

26

27

28

1

## II.    INTRODUCTION

2

### A.    THE SUBJECT ACCIDENT

3      On June 4, 2006 plaintiff Christine Keyes drove her daughter-in-law Meranda

4   Jackson's 2004 Hyundai Accent ("Accent").  Although plaintiff testified that she borrowed

5   the Accent, Ms. Jackson reported to her insurer that plaintiff stole the Accent without her

6   permission.  See Deposition of Christine Keyes, 03/17/09, v. 1, p. 90, lns. 22-24, Exhibit 1;

7   Recording Of Jackson Telephone Conversation, Exhibit 2.  At approximately 4:50 p.m.,

8   plaintiff was driving eastbound on Garwood Avenue in Las Vegas, Nevada.  See Police

9   Report, Exhibit 3.  As plaintiff entered the intersection of Garwood Avenue and Ransom

10  Drive, she was involved in an offset frontal impact collision with a Dodge Stratus driven by

11  Cynthia Dufala.  Id.

12      Immediately after the accident, Ms. Dufala used her cellular telephone to take

13  photographs of the accident scene.  See Deposition of Cynthia Dufala, 01/16/09, p.5, lns.

14  9-10, Exhibit 4.  One photograph clearly depicts a deployed airbag in the subject vehicle.

15

16

17

18

19

20

21



22

23

24

25

26

27  See Dufala Photographs, Exhibit 5.  While photographing the scene, Ms. Dufala

28  approached plaintiff's door and observed that the airbags in the Accent had deployed.

1    Q.    How close did you get to plaintiff's vehicle?

2    A.    I was -- I looked inside the door at her.

3    Q.    So you looked inside the door at the plaintiff.  Did you notice the airbag was deployed?

4    A.    It was.  I think she had two of them.

See Exhibit 4 at p. 45, lns. 5-10.  Within two to five minutes after the accident, Kim Shugars, Ms. Dufala's then boyfriend, arrived.  See Deposition of Kim Schugars, 01/16/09, pp. 71-72, lns. 24-2, Exhibit 6.  Mr. Shugars testified the airbags were deployed and deflated by the time he looked in the Accent.

Q.    And when you first saw inside of plaintiff's vehicle, the Hyundai, did you notice whether or not the airbags had deployed?

A.    Yeah, to the best of my recollection, because there was white powder on the dashboard, and they had -- I guess, what do they do, deflate?

Id. at p. 27, lns. 10-15; also p. 76, lns. 3-9.

Along with the two witnesses, the police and EMT reports state that the airbags in the Accent deployed.  See Exhibit 3; Las Vegas Fire and Rescue EMS Report, Exhibit 7. Firefighters testified that the airbag deployed prior to their arrival on-scene and not after their arrival or during the extraction of plaintiff.  David Lewis of Las Vegas Fire and Rescue (LVFR) testified that had the airbag in the Accent deployed after the accident, the post-accident deployment would have been noted and passed on to the hospital for purposes of diagnoses and treatment.

Q.    Well, I have a question for you regarding airbag deployment.  One of the allegations in this case is that -- one of plaintiff's experts states that the airbags deployed when the fire department arrived on scene and opened the doors to the vehicle.

A.    I don't remember that at all.  That – I couldn't even tell you if that really happened.

Q.    Let me ask you this, then.  Had the airbags deployed when you arrived on scene, would that be something that would be noted in records and reports?

A.    If it was something that we did?

Q.    If the airbag had deployed when you guys had arrived on scene or after you had arrived on scene, would that be something that would

1 | be noted in reports?

2 | A.    Yeah, it would have to.  It would have to, because when we're giving
3 | telemetry to the hospital, we have to basically paint them a picture of
  | what we see.  You know, telling them that there's inches of intrusion in
4 | the engine compartment lets them know the type of mechanism of
  | injury, how fast they might have been going, the type of injuries they
5 | might have been having.  The airbag deployment is going to let them
  | know, you know, all this stuff right there.  So if --

6 See Deposition of David Lewis, 02/18/09, pp. 28-29, lns. 12-14, Exhibit 8.  Mr. Lewis then

7 identified the deployed airbag in Ms. Dufala's post-accident photographs that were taken

8 prior to his arrival on-scene.  See Exhibit D to Exhibit 8.

9 Following the accident, plaintiff was transported by LVFR to the University Medical

10 Center (UMC).  See Exhibit 7.  Medical records obtained from UMC show forearm injuries

11 consistent with airbag deployment.  On the day of the accident, a UMC progress report

12 notes "raised hives on arms."  See UMC Interdisciplinary Progress Notes, 06/04/06, Exhibit

13 9.  The day following the accident, a UMC Care Sheet notes an "ecchymatic area to [right]

14 forearm."  See Adult Critical Care Flow Sheet, 06/05/06, Exhibit 10.

15 **B.    PRE-LITIGATION HISTORY**

16 On September 22, 2006, G. Dallas Horton & Associates purchased the Accent for

17 preservation from GreenLeaf Auto Recyclers in Las Vegas, Nevada.  See Horton

18 Purchase Records, pp. 1-2, Exhibit 11.  Correspondence from plaintiff's counsel states that

19 GreenLeaf should "pull the vehicle to prevent any sells of the parts."  Id. at p. 3.

20 By letter dated January 12, 2007, Ms. Keyes' attorney made a claim with HMA for

21 damages she sustained in the accident.  The basis of Ms. Keyes' claim was that "at the

22 time of impact Ms. Keys [sic] **airbags did not deploy**."  See G. Dallas Horton Letter,

23 01/12/07, Exhibit 12.  Plaintiff's counsel also confirmed to HMA that he preserved the

24 Accent.  Id.  By follow-up letter dated January 16, 2007, Mr. Horton reiterated his earlier

25 defect contention but added that "[t]he airbags deployed only after the car came to a rest

26 and Ms. Keys [sic] was being extracted from the car by the paramedics."  See G. Dallas

27 Horton Letter, 01/16/07, Exhibit 13.  Included with Mr. Horton's January 16, 2007 demand

28 letter was an expert report of William Morrison dated September 22, 2006.  See Morrison

1    Report, 09/22/06, Exhibit 14.  Morrison opined that the airbags in the Accent did not deploy
2    until "medical personnel arrived at the scene and opened the door to access Christine
3    Keys [sic]."  Id. at p. 2.  Based on his assessment, Morrison opined the airbag in the
4    Accent should have deployed at the time of the accident.  Id.

5         In response to Ms. Keyes' claims of post-accident airbag deployment, HMA sent an
6    in-house representative on January 19, 2007 to inspect the Accent and read data
7    contained within its SRS Control Module.[1]  The inspection was conducted in the presence
8    of Morrison who appeared on behalf of plaintiff.  See Morison Report, 02/05/07, Exhibit 15.
9    The data read from the SRS Control Module showed that plaintiff was not wearing her seat
10   belt and that both airbags fired during the accident.  See Photographs of SRS Control
11   Module Data, Exhibit 16.  In his February 5, 2007 report, Morrison confirmed that the
12   Accent's SRS Control Module data did "reveal a deploy signal to the airbag."  See Exhibit
13   15.  Morrison went on to state that he thought that there "**may be a design problem or a**
14   **failure of a part**" and he recommended that plaintiff's counsel retain "an engineer familiar
15   with the design of the system."  Id.

16        C.   LITIGATION HISTORY

17        On April 25, 2008, plaintiff filed her Complaint in Nevada state court, alleging
18   negligence, strict liability, and breach of warranty claims.  See Complaint.  Plaintiff's
19   Complaint alleged that the airbags failed to deploy during the accident.  Id.  On May 16,
20   2008, plaintiff filed an Amended Complaint in Nevada state court alleging the same liability
21   theories but adding that the driver's seat belt also failed during the accident.  See
22   Amended Complaint, ¶¶ 10, 12, 17, 19, 23.

23        Subsequent to HMA's removal of this case to this Court, the parties agreed to a
24   staggered expert discovery schedule.  The staggered schedule adopted by this Court was
25   designed to reduce the high costs associated with expert discovery by allowing HMA's
26   experts to inspect the product and render opinions in light of the defect contentions put
27   forth by plaintiff's experts in their reports.  Pursuant to the stipulated discovery schedule,

28   _____
     [1] At the time HMA's in-house representative inspected the Accent, Ms. Keyes had not yet raised allegations
     regarding a seat belt defect.  See Exhibits 12-15.

1    plaintiff served her expert reports on January 29, 2009.  <u>See</u> Plaintiff's Expert Witness

2    Lists, Reports and Writings, 01/29/09, Exhibit 17.  Included with plaintiff's disclosure were

3    reports of Morrison and Gerald Rosenbluth.  <u>See</u> Exhibit 14; Rosenbluth Affidavit/Report,

4    05/08/08, Exhibit 18.  Morrison's report retained the opinion that the airbags in the Accent

5    did not deploy until emergency responders arrived on scene and opened the doors to

6    extract plaintiff.  <u>See</u> Exhibit 14.  Morrison does not identify where he obtained the

7    information regarding the alleged post-accident deployment of the airbag.

8        Rosenbluth relies only upon Morrison to also opine that the airbag system in the

9    Accent was defective because the airbag "did not deploy until the door of the [Accent] was

10   opened subsequent to the impact."  <u>See</u> Exhibit 18 at ¶¶ 4-5.  Rosenbluth also opines that

11   the driver's seat belt failed during the accident.   <u>Id.</u> at ¶ 8.  Rosenbluth's basis for this

12   opinion was a complete lack of evidence of seat belt use during a frontal impact collision of

13   such magnitude as to cause deployment of the airbags.  He opined that there must have

14   been a seat belt malfunction because "there were no loading witness marks on the seat

15   belt webbing nor the anchorage hardware."  <u>Id.</u>

16       Following plaintiff's production of expert reports, counsel for HMA contacted David

17   Thomas, plaintiff's counsel, to coordinate inspections of the Accent by HMA's experts.  Mr.

18   Thomas stated he would confirm the Accent was being stored at the facility identified by

19   plaintiff in interrogatory responses.   <u>See</u> Plaintiff Christine Keyes' Response To

20   Defendant's First Set Of Interrogatories, Interrogatory No. 7, Exhibit 19.  Unable to confirm

21   the location of the Accent, counsel for HMA contacted Accident Solutions and learned that

22   it was no longer storing the Accent.  Documents subsequently obtained by HMA show the

23   Accent was declared abandoned on June 3, 2008, just two months after William

24   Rosenbluth's April 2, 2008 inspection of the Accent for plaintiff, <u>see</u> Exhibit 18 at p. 4, and

25   transferred to Southwest Auto Wrecking for destruction, <u>see</u> Southwest Auto Wrecking

26   Documents, Exhibit 20 at p. 1.  The Accent was destroyed on June 26, 2008.  <u>See</u> Exhibit

27   20 at pp. 1, 4.

28       Following the destruction of the Accent and plaintiff's perjured deposition testimony,

see infra § III(B)(3), plaintiff served written discovery regarding the airbag system in the Accent.  See Plaintiff's Requests For Production Of Documents To Defendant, Exhibit 21.  Plaintiff's discovery seeks detailed information regarding design and performance characteristics of the Accent's airbag.  Id.

With regard to her injuries, plaintiff testified in deposition that as a result of defects in the Accent she sustained injuries to her right and left hips, back, chest, head, vision, and memory.  See Exhibit 1 at p. 30, lns. 12-24; pp. 47-48, lns. 20-6; Deposition of Christine Keyes, 03/23/09, v. 2, p. 157, lns. 13-25; p. 169, lns. 9-23, Exhibit 22.  Plaintiff also alleges high blood pressure, arthritis, headaches, carpel tunnel syndrome, and drug dependence as a result of the accident.  See Exhibit 1 at p. 30, lns. 12-19; Exhibit 22 at p 168, lns. 15-23.

III.   **LEGAL ANALYSIS**

A.   **DISMISSAL IS WARRANTED WHERE PLAINTIFF OR HER AGENTS DISPOSED OF EVIDENCE THAT IS THE SUBJECT OF THIS LITIGATION AND ENGAGED IN DISCOVERY FRAUD.**

Nevada law authorizes dismissal of a lawsuit as a permissible sanction for egregious discovery abuses.  In Nevada, trial courts do not hesitate to impose dismissal in appropriate cases.  Young v. Johnny Ribeiro Bldg., 787 P.2d 777, 780 (Nev. 1990).  This is true even when the discovery abuse does not involve violation of a court order.   Stubli v. Big D Int'l Trucks, Inc., 810 P.2d 785, 788 (Nev. 1991).  Additionally "dismissal need not be preceded by other less severe sanctions . . . "  Young, 787 P.2d at 780.  Selection of a discovery sanction is a matter committed to the trial court's discretion.  Nevada Power Co. v. Fluor Illinois, 837 P.2d 1354 (Nev. 1992).

Preserving the allegedly defective product "is of the utmost importance in both proving and defending against a strict [product] liability action."  Ralston v. Casanova, 473 N.E.2d 444, 448 (Ill. App. 1984).  A party involved in litigation in Nevada bears a duty to preserve evidence that is known or should reasonably be known to be relevant to litigation.  Fire Ins. Exch. v. Zenith Radio Corp., 747 P.2d 911, 914 (Nev. 1987).  This is true even before a suit has been filed.  Id.  If a party does not preserve crucial evidence, it is proper to impose

1    sanctions against the spoliating party, including dismissal of the action.  See Stubli, 810 P.2d

2    785.

3         Nevada courts faced with a litigant's intentional evidence spoliation have concluded

4    that dismissal is justified in appropriate circumstances.  In Stubli, a product liability case,

5    plaintiff brought a claim asserting defects in a truck trailer's suspension system.  Id. at 786.

6    Specifically, the plaintiff alleged that his accident was caused by a negligent welding repair of

7    the right front springhanger on the trailer by one defendant (the "repair defendant"), and the

8    defective design of the springhanger by another defendant.  Id. Plaintiff's insurer, who

9    became involved because of its subrogation interest, had the accident trailer examined by an

10   expert prior to the commencement of the lawsuit.  After completing his examination, the

11   expert opined that the accident was caused by an inadequate weld repair job by the repair

12   defendant.  Id.

13        Subsequently, the cost of storing the accident trailer began to surpass the trailer's

14   salvage value and, as a result, plaintiff's insurer instructed the expert to remove the "failed"

15   part.  Id. at 786.  Accordingly, the expert had the right front springhanger and a corresponding

16   portion of the trailer frame removed from the remainder of the trailer.  Id.  Plaintiff's agents

17   then had the remainder of the trailer discarded as salvage before the defendants' experts had

18   an opportunity to inspect it in its immediate post-accident condition.  Id. at 787.

19        Upon learning of plaintiff's destruction of the trailer, the Stubli defendants filed a

20   motion to dismiss pursuant to NRCP 37.  Id. at 786-87.  The defendants argued that plaintiff's

21   failure to preserve the trailer, including other key components, made it impossible to establish

22   a defense theory.  The trial court granted the motion to dismiss.  Id. at 788.

23        In affirming the trial court's dismissal, the Nevada Supreme Court identified a

24   non-exhaustive list of factors to consider in deciding whether a dismissal is appropriate.  The

25   factors include:

26        1)   the degree of willfulness of the offending party;

27        2)   the extent to which the non-offending party would be prejudiced by a lesser
               sanction;
28

12

3)   the severity of the sanction of dismissal relative to the severity of the discovery abuse;

4)   whether any evidence has been irreparably lost;

5)   the policy favoring adjudication on the merits;

6)   whether sanctions unfairly operate to penalize a party for the misconduct of his or her attorney; and

7)   the need to deter both the parties and future litigants from similar abuses.

Id. at 787 (citing Young, 787 P.2d at 780).

Considering these factors, the Stubli court found that the trial court had properly dismissed plaintiff's complaint. First, plaintiff's claims revolved around the allegedly defective design and repair of the trailer's suspension system, most of which was discarded by Stubli's agents. Id. at 788. The court found that the lost evidence would be necessary to prove or disprove defendants' theory that driver error, not a defect, caused the accident. Id. Finally, the Stubli court agreed with the trial court that a lesser sanction such as excluding the expert's testimony was insufficient to cure the prejudice. Id. The Stubli court explained:

> Relevant evidence in this case has been irreparably lost due to the willful actions of Stubli's agents. A lesser sanction, short of deeming respondents' theory admitted by the offending party and granting summary judgment in respondents' favor, will not compensate for that loss. Although dismissal precludes adjudication on the merits and penalizes Stubli for the misconduct of his attorney and expert, such consequences are unavoidable and are outweighed by the need to remedy the unfair litigation practices employed in this case, and the benefit of deterring similar abuses in future cases.

Id.

Where spoliation of evidence is accompanied by discovery fraud designed to enhance the offender's case, prejudice to the non-offending party is heightened and dismissal is the only judicious remedy. Stubli relied, in part, on an earlier Nevada Supreme Court decision in Young, 787 P.2d 777 (1990). In Young, the court upheld the trial court's dismissal where the plaintiff had willfully added entries in a business diary (which purported to memorialize conversations critical to the issues at hand) during the discovery period but shortly before he produced the subject diaries to the defendants. 787 P.2d at 778-79. A forensic expert confirmed that the entries in question were not made contemporaneously with the subject

13

1  conversations as plaintiff had represented, and as a result, the court ultimately concluded that

2  the entries in question were fabricated and that the plaintiff had fabricated them willfully.  Id.

3  Accordingly, the trial court dismissed plaintiff's complaint with prejudice.  Id.

4         Just as the court would do a year later in Stubli, the Nevada Supreme Court

5  considered the factors set forth above and affirmed the trial court.  The Supreme Court noted

6  that it had previously "affirmed sanctions of dismissal and entry of default judgment based on

7  discovery abuses even less serious than [plaintiff's]."  Young, 787 P.2d at 780.  The Young

8  court further held that the trial court has inherent powers, independent of those granted by

9  the rules, to control abusive litigation practices, and that the trial court may exercise that

10  power to dismiss an action in appropriate circumstances.  787 P.2d at 779.

11         The Young standard dictates that when key evidence is spoliated and discovery fraud

12  is present, the threshold for establishing prejudice is lessened.  Although the Young court

13  found that the defendant could present costly forensic expert testimony to other diary entries,

14  the court noted that the defendant "would be prejudiced if required to respond with expensive

15  forensic expert testimony."  787 P.2d at 780.  The Young court was not concerned with the

16  fact that the expert analysis could have been performed.  Rather, it was concerned that

17  plaintiff's conduct was so injurious to the administration of justice that it would be unfair to

18  compel the party innocent of discovery fraud to expend vast sums defending itself in the face

19  of such litigation tactics.

20         The Nevada Supreme Court also has upheld dismissals of various actions for far less

21  egregious conduct than plaintiff has committed in the present case.  It is well settled in

22  Nevada that NRCP 37(d) "sanctions entry of a default judgment for failure to answer

23  interrogatories" and that "[a]n incomplete or evasive answer is treated as a failure to answer."

24  Kelly Broad. Co., Inc. v. Sovereign Broad., Inc., 606 P.2d 1089, 1092 (Nev. 1980).  Further,

25  the Nevada Supreme Court has determined on numerous occasions that evasive or

26  incomplete discovery responses justify dismissal.  See Temora Trading Co., Ltd. v. Perry,

27  645 P.2d 436, cert. denied, 459 U.S. 1070 (Nev. 1982) (Supreme Court upheld default

28  judgment against the defendant where defendant failed to appear for deposition and willfully

1   provided inadequate interrogatory responses); <u>Havas v. Bank of Nevada</u>, 613 P.2d 706 (Nev.

2   1980) (Supreme Court upheld trial court's striking of plaintiff's complaint where plaintiff

3   willfully failed to answer defendant's interrogatories); <u>Kelly Broad.</u>, 606 P.2d at 1091-92

4   (Nevada Supreme Court upheld trial court's striking of defendant's amended answer where

5   defendant "intentionally and in bad faith" failed to complete discovery).

6        Courts in other jurisdictions have found the dismissal sanction to be appropriate in

7   circumstances like these.  In <u>Baker v. Myers Tractor Services, Inc.</u>, 756 S.2d 149, 150 (Fla.

8   1st DCA 2000), a Florida trial court "dismissed a plaintiff's lawsuit as a sanction for the

9   plaintiff's material false testimony during discovery concerning facts which directly related to a

10  central issue of the action."  The court stated that it is well settled in Florida that intentionally

11  "false or misleading answers in sworn discovery that either appear calculated to evade or

12  stymie discovery on issues central to [the litigants] case…" justify dismissal.  <u>Id.</u>  Specifically,

13  the plaintiff in <u>Baker</u> was claiming injury to his right knee.  <u>Id.</u>  During the course of discovery,

14  <u>Baker</u> represented on numerous occasions, while under oath, that he had never sustained

15  prior injuries to his right knee.

16       Subsequent discovery by the defendant revealed that <u>Baker</u> had indeed sustained a

17  prior injury to his right knee while on the job and that he lied under oath about a football injury

18  that he suffered in high school.  <u>Id.</u>  The trial court ultimately determined "[plaintiff] knowingly

19  concealed the existence of these prior knee injuries with the intent to perpetrate a fraud upon

20  the court…," "[t]he questions which [the plaintiff] was asked at deposition were

21  straightforward and easily understandable, and clearly required disclosure of these prior

22  injuries . . . ," and "this [was] particularly true, since the condition of [plaintiff's] right knee was

23  the central issue in this case."  <u>Id.</u>  Based on that conclusion, the trial court reasoned as

24  follows:

25       Based upon the foregoing, this court concludes that [the plaintiff] knowingly and
         intentionally concealed prior injuries to his right knee in an attempt to gain an
26       unfair advantage in this litigation.  Such conduct is a serious affront to the
         administration of justice.  **Honesty is not a luxury to be invoked at the**
27       **convenience of a litigant.**  Instead, complete candor must be demanded in
         order to preserve the ability of this court to effectively administer justice . . . . [A]
28       system that relies upon an adversary's ability to uncover falsehoods is doomed

to failure.  **In the instant case, the repeated lies by [the plaintiff] constitute knowing and intentional misconduct justifying dismissal.  This is particularly true given that these misrepresentations occurred repeatedly and went to the central issue in this case.**  If these misstatements had remained undiscovered, the ability of this court to impartially adjudicate this claim would have been seriously impaired.  While it is clear that every litigant has the right to proceed forward, it is equally clear that this is a right which can be forfeited.  Given the serious nature of [the plaintiff's] misconduct, this court not only has the right, but the obligation to involuntarily conclude these proceedings.

Id. (emphasis added).

The Florida appellate court affirmed the trial court's dismissal, agreeing that "the false testimony of [plaintiff] did not concern a matter collateral to his claim, but was directly related to a central fact necessary to establish his claim."  Id.

In Cox v. Burke, 706 S.2d 43, 47 (Fla. 5th DCA 1998), a Florida appellate court upheld a trial court's dismissal of a plaintiff's legal malpractice claim against her former lawyers based on the trial court's finding that the plaintiff gave false and/or misleading responses in her interrogatory answers, deposition, and affidavit.  Interestingly, plaintiff argued on appeal that the false information she gave did not constitute a fraud on the underlying claims of legal and medical malpractice as defendants had discovered the deceit by obtaining volumes of medical records and, therefore, had not been damaged in their discovery.  Id. at 46.  The appellate court responded to those arguments as follows:

It is true that the alleged misrepresentations do not concern the issues of liability on the medical or the legal malpractice claims and, on the surface, both claims appear legally sufficient and factually supportable.  The misrepresentations do go directly to the issue of damages however.  The ability to find records and witnesses that might shed light on the issue of any damages suffered by [the plaintiff] is as critical to the defense of the case as is the issue of liability itself . . . [and] **apart from the irony of the argument that [the plaintiff] should not be punished because she failed to deceive, it is impossible to know what defendants may not have found.**

Id. at 46.

In affirming the trial court's dismissal, the appellate court concluded:

[The plaintiff] clearly has been shown to have given many false and misleading answers in sworn discovery that either appear calculated to evade or stymie discovery on issues central to her case.  **The integrity of the civil litigation process depends on truthful disclosure of facts.  A system that depends on an adversary's ability to uncover falsehoods is doomed to failure,**

16

1   **which is why this kind of conduct must be discouraged in the strongest**
    **possible way."**

2   Id. at 47 (emphasis added).

3       **B.    THE SPOLIATION OF THE SUBJECT VEHICLE AND PLAINTIFF'S WILLFUL DISCOVERY**
4               **FRAUD DEMAND DISMISSAL OF THIS ACTION.**

5       Applying the factors set forth in Young and Stubli to the facts of this case, plaintiff's

6   evidence spoliation and discovery fraud demand dismissal with prejudice.

7               **1.    Dismissal Is Appropriate Because Plaintiff's Agents Willfully**
                **Destroyed The Accent.**

8       The most important element of evidence in this matter was under plaintiff's control

9   when it was declared abandoned and destroyed.  See Exhibit 20.  Although plaintiff's counsel

10  purchased the Accent on plaintiff's behalf, see Exhibit 11, and informed HMA that it was

11  preserved, see Exhibit 12, plaintiff and her agents failed to ensure the Accent was preserved

12  and available for inspection by HMA's experts.  Nor did plaintiff or her counsel inform HMA

13  that the Accent was abandoned so that HMA could preserve it for future inspection.

14      Plaintiff was aware that her attorney was preserving the subject vehicle on her behalf.

15      Q.    Do you know if your attorney preserved the subject vehicle for this litigation
16            after the accident?

17      A.    Yes.

18  See Exhibit 1 at pp. 10-11, lns. 25-2.  When it came time to recall documents regarding the

19  preservation of the subject vehicle, plaintiff testified simply that she did not recall.

20      Q.    Did you complete any paperwork authorizing the storage of the
              subject vehicle after the accident?
21

22      A.    I don't recall.

        Q.    Do you recall completing any paperwork authorizing the purchase or
23            transfer of the subject vehicle after the accident?

24      A.    I don't recall.

25  Id. at p. 13, lns. 1-7.  When asked whether she authorized Accident Solutions to transfer the

26  subject vehicle for destruction, plaintiff testified only that she did not recall.

27      Q.    Do you know if you authorized Accident Solutions to transfer the
              subject vehicle?
28

1    A.    I don't know.  If I did, I don't remember.

2    Id. at p. 21, lns. 15-17; p. 22, lns. 14-16.

3    To date, plaintiff has produced no documents evidencing a contract for the storage

4    of the Accent and the terms of that contract.  What plaintiff did allow, however, was for

5    William Rosenbluth of Automotive Consulting Services, Inc., the company retained as her

6    seat belt experts, to inspect the Accent on April 2, 2008 at Accident Solutions in

7    anticipation of preparing expert reports.  See Exhibit 18 at p. 4.  On June 3, 2008, just two

8    months after her expert's inspection, the Accent was deemed abandoned and sold for

9    salvage.  See Exhibit 20.  It then was crushed on June 26, 2008.  Id. at pp. 1, 4.  Plaintiff's

10   agent, Accident Solutions, willfully had the Accent disposed of when it called Southwest

11   Auto Wrecking and declared the Accent abandoned.    See Exhibit 20; DMV Junk

12   Certificate, Exhibit 23.  What is not known is whether plaintiff or her counsel gave Accident

13   Solutions the authority to have the Accent destroyed.  Plaintiff's discovery fraud, however,

14   heightens the willfulness of plaintiff and her agents' conduct in working to stymie HMA's

15   ability to defend this matter.  See infra § III(B)(3).

16            **2.    HMA Would Be Unfairly Prejudiced By Any Sanction Other Than
                      Dismissal Of This Action With Prejudice.**

17   In a product liability action such as this, the most important case dispositive evidence

18   is the product itself.  Here, plaintiff and her agents failed to preserve the product, the Accent.

19   In so doing, plaintiff and her agents allowed for the destruction of not only plaintiff's ability to

20   prove that a defect existed and was the cause of plaintiff's injury but also the ability of HMA to

21   defend this action by proving that the Accent's airbag and seat belts were defect free and

22   performed as expected during the accident.

23   The Accent is the most critical piece of evidence not only because it was involved in

24   the accident but also because it contains all of the physical evidence necessary for plaintiff to

25   prove her case and for HMA to defend by proving that the airbag and seat belts performed as

26   expected.  The central issues in this case include the pre-accident condition of the Accent,

27   including alterations, modifications, and pre-existing damage that caused or contributed to

28

1   plaintiff's injuries, and the post-accident condition of the Accent and whether any defects

2   were evident with its airbag or seat belts that caused or contributed to plaintiff's injuries.

3                    ***a.      Because the Accent has been destroyed, HMA is denied the
                              opportunity to assess how preexisting frontal impact***

4   ***damage impacted its performance.***

5          Although plaintiff testified that there was no damage to the Accent as she first drove it

6   on the day of the accident, <u>see</u> Exhibit 1 at pp. 15-16, lns. 14-22, HMA has obtained evidence

7   that Meranda Jackson, the owner of the Accent and plaintiff's daughter-in-law, was involved

8   in a January 6, 2005 accident with a Federal Express truck and another car.  <u>See</u> Meranda

9   Jackson Claim File, pp. 7-8, Exhibit 24.  <u>See</u> <u>also</u> <u>infra</u> § III(B)(3)(h).  Less than two months

10  prior to plaintiff's accident, a service technician for Planet Hyundai inspected the Accent and

11  noted significant damage to the Accent's rear bumper and right quarter panel, right front

12  passenger door and front fender, windshield, and driver side front bumper area.  <u>See</u> Planet

13  Hyundai Service Records, 04/18/06, p. 2, Exhibit 25.  The service records also show that Ms.

14  Jackson declined to have damage to the Accent repaired.  <u>Id.</u> at p. 1.

15         Analyzing pre-existing damage to an accident vehicle is critical to understanding the

16  accident itself and accurately calculating the direction of impact, speed at impact and change

17  in speed and direction as a result of the impact.  It does not appear that plaintiff's experts

18  even considered pre-accident damage in their analysis as they were not likely informed of the

19  damage by plaintiff or her counsel.  <u>See</u> Exhibits 14-15, 18.  Now, because the Accent was

20  destroyed by plaintiff and her agents, neither experts retained by HMA or plaintiff will be able

21  to factor pre-accident damage in their accident reconstruction calculations and their analysis

22  of airbag and seat belt performance.  As a result, HMA is prejudiced in its defense of this

23  matter.  Plaintiff's experts are likewise prejudiced as any accident reconstruction or airbag

24  and seat belt opinions rendered without consideration of the significant pre-accident damage

25  identified by the Planet Hyundai service technician are fundamentally flawed while any future

26  analysis will be based on pure speculation as the accident vehicle is no longer available for

27  analysis.

28  / / /

**b.    *Because the Accent has been destroyed, HMA is denied the opportunity to inspect damage patterns and how the airbag and seat belt performed during the accident.***

With respect to the post-accident condition of the Accent, HMA is prejudiced as it can no longer have its experts inspect damage patterns to the Accent's airbag and seat belt. Although data stored on the Accent's SRS Control Module shows that plaintiff was not wearing her seat belt at the time of the accident and that the airbags deployed during the accident, HMA is prejudiced in its defense of plaintiff's defect contentions because its experts were denied an opportunity to conduct a thorough examination of damage patterns on and in the Accent.

Observing and measuring damage patterns on an accident vehicle are crucial to accurately reconstructing an accident and determining the direction of impact, speed at impact, and change in speed and direction as a result of the impact. All of this information is necessary to understanding the performance of airbags and seat belts during any given accident, including this one. In addition, it is critical to observe and measure damage patterns and points of contact between an occupant and the interior surfaces of an accident vehicle in order to understand what was happening to an occupant during the accident sequence, including whether there is evidence of contact by plaintiff with the airbag and any other interior surfaces such as the knee bolsters and center consol. Because plaintiff allowed for the destruction of the Accent before HMA's experts' inspections, HMA's experts are denied the opportunity to observe and measure this essential evidence contained only on or within the Accent itself.

In their expert reports, plaintiff's own experts concede the prejudice to HMA by showing they are no longer able to render opinions in support of plaintiff's claims. Morrison opined in his February 5, 2007 report to plaintiff's counsel that he was not the "best answer" to render opinions with respect to an alleged defect with the Accent's airbag. See Exhibit 15. He opined that "there **may be** a design problem **or a failure of a part** . . . and **an engineer familiar with the design of the system may be the best answer**." Id. Because plaintiff never retained an expert familiar with the design of the airbag in the Accent prior to allowing it

1   to be destroyed, any future expert retained by plaintiff will never be able to inspect the

2   Accent's airbag or seat belt.  Likewise, HMA will not be able to defend this action by having

3   its experts inspect the airbag or seat belt.

4        Morrison also opined that "[t]he delay deployment of the Keyes Hyundai will most

5   likely be assisted by the emergency personnel at the scene."  Id.  He opined that the airbags

6   did not deploy until emergency responders opened the door to the Accent.  See Exhibit 14.  It

7   is unknown where Morrison obtained this information as none of the emergency personnel

8   deposed to date agree.  In fact, accident scene photographs taken by the other driver, Ms.

9   Dufala, immediately after the accident but prior to the arrival of medical personnel show a

10  deployed and deflated airbag.

11       Nor did plaintiff offer testimonial support.  Rather, plaintiff testified that she did not

12  recall the airbags deploying at any time after the accident while she was in the subject

13  vehicle.

14       Q.    You said the airbag did not deploy during the subject accident.  Do
15             you know if it deployed at any time while you were in the subject
               vehicle?

16       A.    Not that I know of.

17  See Exhibit 1 at p. 125, lns. 6-9;

18       Q.    So although you contend that the airbag did not deploy during the
19             subject accident, you cannot tell me at all if the airbag deployed at all
               while you were in the subject vehicle; is that correct?

20       A.    It did not deploy.  I can tell you that.

21  Id. at p. 137, lns. 15-19.  Whether plaintiff's expert was simply guessing or was provided

22  different information by plaintiff than plaintiff was willing to testify to at her deposition is

23  unknown.  What is known is that the only evidence that would refute plaintiff's claim of a post-

24  accident airbag deployment has been destroyed and HMA is left with nothing more than

25  speculation on behalf of plaintiff's experts or plaintiff's perjured deposition testimony to rebut

26  plaintiff's airbag defect contentions.

27       With respect to plaintiff's contention that the seat belt failed during the accident,

28  Gerald Rosenbluth, plaintiff's seat belt expert, said there were no witness marks on the seat

belt that would otherwise be present if plaintiff was restrained during the accident.  In order to get around the complete lack of accident related damage to the subject seat belt, Rosenbluth opined that the seat belt must have failed during the accident sequence because "there were no loading witness marks on the seat belt webbing nor the anchorage hardware."  See Exhibit 18 at ¶ 8.  He then opined that the malfunction was most likely "a false latch condition resulting in a probable inadvertent release."  Id.

Clearly, Rosenbluth's opinions impeach plaintiff's testimony that after the subject accident, the seat belt was still on and she was unable to remove it.

> Q.    And do you recall, though, that the seat belt was still pulled across you
>       -- tight across your shoulder the way you had put it on originally?
>
> A.    It was still on.

See Exhibit 1 at pp. 129-30, lns. 24-3.

> Q.    And so you wouldn't recall, then, how you removed the seat belt; is
>       that correct?
>
> A.    No.
>
> Q.    But you do recall that after the accident it was still latched and you
>       were still belted –
>
> A.    Yes.

Id. at pp. 115-16, lns. 22-2.

As with Morrison, there is a fundamental disconnect between testimonial evidence presented by plaintiff and the opinions of Rosenbluth who impeaches his own client's testimony by showing that there was absolutely no physical evidence on the seat belt webbing or its hardware to support the contention that plaintiff was restrained at the time of the accident.  His attempt to wiggle around this disparity is to opine that the seat belt malfunctioned by unlatching during the accident.  If this were the case, however, the seat belt would not have remained on and latched following the accident as plaintiff testified.

Although plaintiff produced Rosenbluth's report on the date plaintiff's expert disclosures were due, Rosenbluth himself stated that he required an additional physical examination and testing of the seat belt.  According to Rosenbluth, who never personally

inspected the Accent or its seat belt prior to issuing his sworn affidavit/expert report,[2] he opined that "**[f]urther examination and testing of the seat belt buckle receiver mechanism of a physical and radiographic nature will be necessary** to support these preliminary conclusions and opinions." See Exhibit 18 at ¶ 10.  As such, Rosenbluth's sworn affidavit/expert report clearly shows the prejudice to HMA by showing that plaintiff's own seat belt expert cannot substantiate his own opinions without further physical inspection.

Because Rosenbluth cannot validate his "preliminary conclusions and opinions" absent additional "physical and radiographic" examinations and "testing" of the seat belt, plaintiff cannot now demonstrate that the seat belt in the Accent was defective or failed to perform as designed because plaintiff and her counsel failed to preserve the physical evidence.  HMA is unduly prejudiced in defending against plaintiff's claims because it was never given the opportunity to inspect the Accent in light of a claim that the seat belt failed.

Discovery propounded by plaintiff following the spoliation of the Accent clearly demonstrates the prejudice to HMA and shows that plaintiff, even with all documents sought, cannot prove that the airbag and seat belt were defective, that they failed to conform or perform according to specification, or that they were the cause of plaintiff's injuries because the physical evidence necessary to do so has been destroyed.  Examples of documents sought include schematic diagrams for the SRS Electronic Control Unit and associated component value tables; documents showing the data conventions in the SRS ECU and signing conventions with all documents covering subparts; all documents relating to EEPROM/Flash Memory and/or PIDS including loaded values translational program data files, and interpretive program data files; and acceleration/displacement/ kinematics/electrical performance charts in passive restraint verification crash tests.  See Exhibit 21.

The discovery served on HMA after plaintiff spoliated the Accent and produced expert reports demonstrates that plaintiff now grasps at straws in an effort to find something to support her defect contentions other than her original experts whose opinions are unsupported by the evidence and which can no longer be substantiated by physical

---

[2] Plaintiff's April 2, 2008 vehicle inspection was performed by William Rosenbluth of Automotive Consulting Services, Inc. and relied upon by Gerald Rosenbluth in formulating his opinions.  See Exhibit 18 at p.4.

examination and testing.  The discovery is also futile and a waste of HMA's resources.  Even if plaintiff were now in possession of all documents and system values sought, plaintiff lacks the ability to physically examine the evidence to determine whether the airbag and seat belt conformed to specification and performed as designed.  Likewise, HMA's defenses have been hampered.

By failing to preserve the Accent, plaintiff and her agents allowed for the destruction of the only case dispositive evidence to all parties.  As a result, plaintiff can no longer meet her fundamental burden of proof to establish that a product defect existed and was the cause of plaintiff's injuries.  Just as plaintiff's failure to preserve the Accent prejudiced her own expert's ability to establish that an airbag and seat belt defect existed and that the defect was the cause of plaintiff's injuries, so too have HMA's defenses been prejudiced in ways cured only by dismissal.

### 3. Dismissal Is the Appropriate Sanction For A Plaintiff Who Has Spoliated Evidence And Engaged In Discovery Fraud To Stymie HMA's Defenses And Enhance Her Claims.

Not only did plaintiff and her agents allow the Accent to be destroyed but so to did plaintiff engage in the most sever form of discovery abuse by willfully hiding evidence and giving perjured testimony.  The Stubli court dismissed a plaintiff's case where the plaintiff at least appeared to be trying to preserve the components his agents believed to be relevant to plaintiff's claims.  810 P.2d at 786-87.  There was certainly no indication in Stubli that plaintiff acted with the intention of harming the defendant's case.  The spoliation at issue here, however, is far more severe than the spoliation justifying dismissal in Stubli as plaintiff and her agents not only allowed for the destruction of the Accent, but plaintiff willfully engaged in discovery fraud to stymie HMA's defenses and enhance her claims.

In her written discovery and deposition testimony, plaintiff attempted to conceal evidence and perjured herself concerning facts that relate directly to plaintiff's claims in this matter, including her prior medical history and pre-existing injuries, preexisting damage to the Accent on the day of the accident, pre-accident income, education history, her mitigation of damages, her physical characteristics at the time of the accident, her pre-accident drug use,

1   and past litigation history.  Here as in <u>Baker</u>, "false or misleading answers in sworn discovery

2   that either appear calculated to evade or stymie discovery on issues central to [the litigants]

3   case…" justify dismissal.  756 S.2d at 150.

4              **a.**    **To enhance her damages claim, plaintiff concealed evidence**

                      **and committed perjury about a substantial pre-existing**

5                      **medical history.**

6      In an effort to conceal substantial pre-existing medical conditions, plaintiff lied in

7   sworn interrogatory responses and at her deposition regarding pre-accident medical

8   conditions and treatment providers.  In response to Interrogatory No. 2 of HMA's First Set

9   of Interrogatories, plaintiff stated "I don't recall any" when asked to identify all health care

10  providers who treated plaintiff for the five years preceding the subject accident.  <u>See</u>

11  Exhibit 19 at Interrogatory No. 2.

12      At her deposition, plaintiff testified that prior to the subject accident she was healthy,

13  never had any injuries which prevented her from working, and never got sick.

14      Q.    Prior to your accident, were there ever any periods where you had

                  injuries that prevented you from working?

15

16      A.    **Never.  I get colds a lot now, and it used to be where I'd get a cold**

                  **maybe once every ten years.**

17      Q.    A cold?

18      A.    A cold, yes.  **I never was a person that gets sick**.

19  <u>See</u> Exhibit 22 at pp.156-57, lns. 24-7.  With respect to receiving treatment from Las

20  Vegas area hospitals and quick care facilities, plaintiff testified that she only treated at

21  Summerlin Hospital on one occasion for an infection but was never treated by the others.

22      Q.    Ms. Keyes, since living in the state of Nevada, have you ever had

                  occasion to seek treatment at any of the Las Vegas hospitals prior to

23                  the subject accident?

      . . .

24

      Q.    Including Quick Care.

25

26      A.    Yes.

      Q.    Where at?

27

28      A.    I believe I went to Summerlin Hospital.

Q.     On how many occasions?

A.     I think I went to Summerlin once, I believe.

Q.     For what?

A.     I believe I had an infection or -- I had a high fever.

. . .

Q.     Is that the only occasion?

A.     I believe that's the only -- I --

. . .

Q.     Did you ever treat at any of the local Quick Cares prior to the accident?

A.     Not that I recall.

Q.     Did you ever treat at UMC?

A.     No.

Q.     Not any –

A.     Not that I recall.

<u>Id.</u> at pp. 201-02, lns. 18-19.

At her deposition, plaintiff testified that she had never had any pre-accident hip or back problems.

Q.     Did you ever have any hip problems prior to the subject accident?

A.     **No.**

<u>See</u> Exhibit 1 at p. 27, lns. 22-24.

Q.     Prior to the subject accident, did you have any back problems?

A.     **No.**

Q.     Never?

A.     **Never.**

<u>Id.</u> at p. 28, lns. 15-19.

At her deposition, plaintiff testified that she never had any pre-accident chest pain and had never been diagnosed with hypertension or high blood pressure.

Q.     Prior to the subject accident, did you ever have high blood pressure?

26

A.    **No.**

Id. at pp. 31-32, lns. 25-2.

Q.    Prior to June 4th, 2006, did you ever experience chest pain?

A.    **No.**

Q.    Prior to June 4th, 2006, did you ever have any medical conditions, like hypertension or high blood pressure, or anything like that?

A.    **No.**

See Exhibit 22 at p. 167, lns. 13-19.

At her deposition, plaintiff testified that she had never been diagnosed with arthritis prior to the accident.

Q.    Did you ever have arthritis in the knees prior to the subject accident?

A.    **No.**

Q.    Did you ever have arthritis anywhere prior to the subject accident?

A.    **No.**

Id. at p. 30, lns. 6-11.

Although plaintiff testified to always being healthy prior to the subject accident and denied ever having any of the maladies for which she now seeks damages from HMA, plaintiff has a lengthy treatment history, only some of which has been found by HMA. HMA did not obtain these pre-accident treatment records by virtue of plaintiff having identified them as pre-accident treatment providers but because they were provided by entities that provided care and treatment to plaintiff following the accident.

Having obtained some pre-accident treatment records, HMA has learned that plaintiff was transported by ambulance to the hospital on no fewer than four occasions in the three years preceding the subject accident.  On September 21, 2003, plaintiff was transported to Summerlin Hospital for "left hip/buttocks pain that radiates up back and down left leg."  See AMR Report, 9/21/03, Exhibit 26.  While at Summerlin, physicians took seven CT Scans of plaintiff's abdomen and pelvis, one chest x-ray, and five x-ray images of plaintiff's lumbar spine.  See Summerlin Hospital X-Ray Department Record, Exhibit 27.

Summerlin Emergency Room records note that plaintiff was admitted for acute low back pain and chest pain. See Summerlin Records, 09/21/03, Exhibit 28. The records note that plaintiff walked with a limp, id. at p. 4, and that she had "multilevel degenerative changes involving the lumbar spine" and "rotary scoliosis" with "multilevel degenerative osteopytic spurring present," see Summerlin Hospital Radiology Reports, 09/21/03, Exhibit 29.

The Summerlin records also note that plaintiff had difficulty ambulating, that plaintiff had limited range of motion, that plaintiff suffered from arthritis of the left knee, that plaintiff had back problems, that plaintiff experienced headaches and fainting spells, and that plaintiff had occasional numbness and tingling of the fingers. See Summerlin Physical Assessment and History Records, 09/21/03, Exhibit 30. Further, they note that plaintiff "says she is unable to work due to her obesity." See Exhibit 28 at p. 4.

On October 14, 2003, plaintiff was evaluated for "chest wall pain" at MountainView Hospital. See MountainView Emergency Physician Record, 10/14/03, Exhibit 31. In response to the record, plaintiff testified that she did not recall having chest wall pain or the treatment. See Exhibit 22 at pp. 206-07, lns. 6-11. On October 15, 2003, plaintiff was evaluated at UMC and diagnosed with hypertension, left hip pain, atypical chest pain, morbid obesity, and lumbar back pain. See UMC Records, 10/15/03, pp. 1, 2, Exhibit 32. The records also note "left hip pain x 5 months – then hip 'went out' – 'couldn't move.'" Id. at p. 1. While at UMC, plaintiff also made a Report of Illness or Physical Disability to the State of Nevada Department of Human Resources, Welfare Division, stating that she was unable to seek work, to attend training, or to prepare for work because of her hip and back problems, id. at p. 2, even though plaintiff testified that she never had any injuries that prevented her from working, see Exhibit 22 at pp. 156-57, lns. 24-7.

When presented with UMC medical records noting the October 15, 2003 diagnoses, plaintiff recalled being treated for hip pain but denied any diagnosis of hypertension or chest pain.

Q.    Do you recall, Ms. Keyes, having this hip pain for which you sought treatment from UMC?

| | | |
|---|---|---|
| A. | What year was that? |
| Q. | 10/15/2003. |
| A. | I recognize that. |

. . .

| | |
|---|---|
| Q. | Do you know what caused that hip pain, Ms. Keyes? |
| A. | No. |
| Q. | It also indicates that you had a complaint -- well, under "Diagnosis" here, Number 1, it says "HTN," which is hypertension.  **Do you recall having hypertension in 2003**? |
| A. | **No.  Never.** |
| Q. | It says left hip pain.  **You recall having hip pain, but do not recall what's caused it; correct**? |
| A. | **Never.** |
| Q. | Do you recall whether or not you had had that left hip pain for the past five months prior to seeking this treatment? |
| A. | No. |
| Q. | Do you recall having atypical chest pain as indicated on this report? |
| A. | No. |

. . .

THE WITNESS:  **I did not have any chest pain.**

. . .

| | |
|---|---|
| Q. | **Do you recall, Ms. Keyes, having pain in your lumbar spine** -- |
| A. | **No.** |

See Exhibit 22 at pp. 207-08, lns. 7-18.

On November 18, 2003, plaintiff was transported by ambulance for "right side pain radiating from mid-back around the right breast."  See AMR Report, 11/18/03, Exhibit 33. At Summerlin Hospital, plaintiff was treated for chest wall and right flank pain.  See Summerlin Hospital Records, 11/18/03, Exhibit 34.  A radiology report noted "degenerative changes to the thoracic spine."  See Summerlin Hospital Radiology Report, 11/18/03, Exhibit 35.

On March 12, 2004, plaintiff was treated at UMC for chronic left knee pain.  See

UMC Record, 3/12/04, Exhibit 36.  The record also notes that plaintiff had elevated blood pressure, id. at p. 1, and that plaintiff ambulated with a limp, id. at p. 2.  When presented with UMC medical records, plaintiff could not recall the treatment and denied any problems existed.

> Q.    Do you recall having elevated blood pressure when you sought treatment at the hospital, Ms. Keyes?
>
> A.    No.
>
> Q.    Do you recall limping on your left leg when you sought treatment, Ms. Keyes?
>
> A.    No.

See Exhibit 22 at p. 209, lns. 14-19.

> Q.    Do you recall them referring you to physical therapy, Ms. Keyes?
>
> A.    No.
>
> Q.    So then you wouldn't recall whether or not you actually went to that physical therapy; is that correct?
>
> A.    I could tell you I didn't.
>
> Q.    That you did not?
>
> A.    Yes.
>
> Q.    Why not, Ms. Keyes?
>
> A.    **Because I didn't have a problem.**

Id. at pp. 209-10, lns. 14-7.

On October 17, 2004, plaintiff was transported by ambulance to Summerlin Hospital for "right flank pain."  See AMR Report, 10/17/04, Exhibit 37.  While at Summerlin, physicians took three chest x-rays and eleven CT Scans of plaintiff's chest, abdomen, and pelvis.  See Exhibit 27.  While admitted to Summerlin, plaintiff was diagnosed with chronic obstructive pulmonary disease and showed signs of cardiomegaly.  See Summerlin Record, 10/17/04, Exhibit 38.  An Interdisciplinary Care Plan form notes that plaintiff was positive for "myocardial infarction" and that she had "musculoskeletal disorders" with limited range of motion and pain.  See Summerlin Hospital Interdisciplinary Care Plan,

10/18/04, Exhibit 39.  A medical history notes that plaintiff suffered from "arthritis" in "both knees."  See Summerlin Hospital History, 10/17/04, Exhibit 40.

On June 12, 2005, plaintiff was treated for "right-sided flank pain" and a cough that she had for about one year.  See UMC Record, 6/12/05, Exhibit 41.  On April 4, 2006, just two months prior to her accident, plaintiff was transported by ambulance for "right flank pain that wraps around into the groin."  See AMR Report, 4/4/06, Exhibit 42.

Post-accident medical records also show that plaintiff reported to treatment providers that she had a history of arthritis.  See UMC Rehabilitation Evaluation (arthritis per patient), 6/20/06, Exhibit 43; UMC Record (chronic knee problems from arthritis), 5/20/07, Exhibit 44.  A UMC Case Management Initial Screening Form prepared on June 5, 2006 notes under "Past Medical History" that plaintiff suffered from "severe spinal stenosis."  See UMC Case Management Initial Screening Form, 6/5/06, Exhibit 45.  In addition, the LVFR EMT Report prepared on the day of the accident notes under medical history that plaintiff suffered from hypertension.  See Exhibit 7 at p. 1.  At her deposition, plaintiff denied being treated for hypertension prior to the subject accident and telling the treating paramedic that she suffered from hypertension.

> Q.   Were you ever treated for hypertension prior to the subject accident, Ms. Keyes?
>
> A.   No.
>
> Q.   Okay.  Do you recall telling the EMT that you had a prior history of hypertension?
>
> A.   No.

See Exhibit 22 at p. 196, lns. 11-16.

Based on the limited pre-accident medical records HMA has obtained to date, it is clear that plaintiff has worked to disadvantage HMA by concealing a significant pre-accident medical history for many of the same conditions she now seeks to recover from HMA, including back, hip, and knee problems, chest pain and high blood pressure, arthritis, and carpel tunnel syndrome.  Because plaintiff engaged in discovery fraud regarding relevant pre-accident medical conditions, dismissal is proper.

**b.   To enhance her liability claim, plaintiff concealed preexisting damage to the subject vehicle.**

In an effort to bolster her liability claim, plaintiff concealed preexisting damage to the Accent prior to the subject accident.  <u>See also supra</u> § III(B)(2)(a).  At her deposition, plaintiff testified that there was no damage to the subject vehicle when she took it on the day of the accident.

    Q.    On the day of the accident, June 4th, 2006, did the subject vehicle have any damage that you are aware of?

    A.    No.  Not that I'm aware of.

    Q.    Had no damage at all?

    A.    Not that I'm aware of.

    Q.    So when you first went to drive the subject vehicle on June 4th, 2006, you don't recall seeing any damage to the vehicle?

    A.    Just might have a flat, but she had a tire on it.  But I wouldn't call that damage.

<u>See</u> Exhibit 1 at pp. 15-16, lns. 17-2.

When asked about frontal or rear impact damage, plaintiff testified that there was none.

    Q.    Do you know if the subject vehicle had any frontal impact damage? Damage to the front bumper, hood area?

    A.    It did not.

    Q.    Do you know if the subject vehicle had any damage to the rear of the vehicle, the rear bumper or anything like that?

    A.    It did not.

<u>Id.</u> at p. 16, lns. 15-22.

HMA has learned that the Accent had significant damage prior to plaintiff's accident.  Ms. Jackson's mother testified that Ms. Jackson was involved in an accident with a UPS truck prior to plaintiff's accident.  She testified that the Accent was rear-ended by the UPS truck and pushed into the vehicle in front of it.  <u>See</u> Deposition of Rene Mojeske, 01/16/09, pp. 22-23, lns. 6-9, Exhibit 46.  According to insurance records, Ms. Jackson's accident occurred on January 6, 2005 and involved a Federal

32

Express truck rather than a UPS truck.  <u>See</u> Exhibit 24 at pp. 7-8.  On April 18, 2006, less than two months prior to plaintiff's accident, a Planet Hyundai service technician inspected the Accent and noted damage to the rear bumper and right quarter panel, right front passenger door and fender, windshield, and driver side front bumper area as shown in the following graphic.



<u>See</u> Exhibit 25.  The service report also notes that no Ms. Jackson declined to have the Accent repaired. <u>Id.</u>

The extent of damage noted by the service technician would have been clearly visible on the Accent as plaintiff went to operate it on the day of the accident, including the broken windshield.  It also would be of substantial import in analyzing plaintiff's accident and the performance of the airbag and seat belt at the time of the accident.

### c. To enhance her damages claim, plaintiff refused to provide documentary evidence supporting her lost income claim and committed perjury about her pre-accident employment and income.

In an effort to enhance her lost past and future wage loss claim, plaintiff committed perjury during her deposition and refused to provide documentary evidence in support of her pre-accident income.   According to plaintiff, she worked as a private contract nurse's assistant and was paid directly by the individual who contracted for her services.

Q. When did you engage in this private employment, looking at your stay in the state of Nevada?  Have you been continuously employed as a private --

A. Yes.

Q. -- nurse since residing in the state of Nevada?

1      A.      Yes.

2      Q.      And you were paid a salary; is that correct?

3      A.      Yes.

4    See Exhibit 22 at pp. 160-61, lns. 25-7.  Plaintiff conceded at her deposition that she did not

5    declare any of her private contract income with the federal government.

6      Q.      -- did you declare your income on your income tax, as well?

7      A.      No.

8    Id. at p. 162, lns. 20-22.

9            When HMA requested documentary support for plaintiff's past income, plaintiff refused

10   to provide any.

11     Q.      Can you tell me how much undeclared income you earned while
              working for –
12
       A.      I couldn't tell you that.
13
       Q.      You wouldn't be able to tell me how much you earned as a private
14             practitioner?

15     MS. RIDENHOUR:  I think she just told you she can't answer that.

16     THE WITNESS:  **I'm not going to tell you that.**

17     BY MR. BLEHM:

18
       Q.      You're not going to tell me that?
19
       A.      No.
20
       Q.      Why not?  **Is it because you cannot or because you will not?**
21
       A.      **Because I will not.**
22
     Id. at p. 185, lns. 5-18.
23
             Plaintiff also testified that she worked for Absolute Home Care for 1 ½ to 2 years.
24
       Q.      Do you recall how many months you worked for Absolute Home Care?
25
       A.      Year, year and a half.
26
       Q.      You worked for them one and a half years?
27
       A.      Maybe two.  Well, you know what?  I worked for them before I had my
28             sister, so say two years.

See Exhibit 1 at p. 57, lns. 15-20.  Plaintiff's contention, however, is not supported by her tax records, which show that plaintiff's only declared income between 2003 and 2007 was in the 2005 tax year, see Internal Revenue Service Report, Exhibit 47, when plaintiff's gross income was $5,240, see Plaintiff's 2005 1040 Form, Exhibit 48.  These earnings do not support 1 ½ to 2 years of work for Absolute or any other entity.

Although plaintiff also testified that she never had any ailments that prevented her from working, see Exhibit 22 at pp. 156-57, lns. 24-7, medical records obtained to date show otherwise.  While treating at Summerlin Hospital in September of 2003, plaintiff informed treatment providers that "she [was] unable to work due to her obesity."  See Exhibit 28 at p. 4.  While at UMC in October of 2003, plaintiff's treating doctor reported to the State of Nevada Department of Human Resources, Welfare Division, that plaintiff was unable to seek work, to attend training, or to prepare for work because of her hip and back problems.  See Exhibit 32 at pp. 1, 2.  Medical records dated September 21, 2003, October 14, 2003, October 17, 2004, April 4, 2006 all note that plaintiff was unemployed at the time she received treatment.  See Intake Forms, Exhibit 49.

### d.   To enhance her damages claim, plaintiff committed perjury about her education history.

In an effort to bolster her claim for lost future income, plaintiff lied in sworn interrogatory responses and at her deposition regarding her level of education.   In response to Interrogatory No. 3 of HMA's First Set of Interrogatories, plaintiff stated that she completed high school through the 12th grade at Corcoran High School in Corcoran, California.  See Exhibit 19 at Interrogatory No. 3.

At her deposition, plaintiff offered the same perjured testimony about her education.

Q.   Did you go to high school in Corcoran?

A.   Yes.

Q.   Where at?

A.   Corcoran High School.

Q.   Did you graduate?

| | |
|---|---|
| A. | Yes. |
| Q. | What year? |
| A. | Oh, '78, '79.  '79, because that's when I left.  I graduated -- I left Corcoran in '79. |
| Q. | So you earned a high school diploma from Corcoran? |
| A. | Yes. |

See Exhibit 1 at p. 37, lns. 1-17.

Although plaintiff contends that she is a high school graduate, plaintiff completed only the 10th grade.  Plaintiff's high school transcript shows she spent her freshman and sophomore years in the young mother's program before enrolling at Corcoran High School as a regular student on August 31, 1977.  See Corcoran High School Transcript, Exhibit 50.  Plaintiff withdrew from Corcoran High School on October 10, 1977 before earning any credit for her junior year.  Id.

> **e.** **To enhance her damages claim, plaintiff committed perjury regarding post-accident participation in medically recommended rehabilitation.**

In an effort to conceal her failure to mitigate damages, plaintiff committed perjury at her deposition regarding her failure to participate in medically recommended physical therapy.  Plaintiff testified that she did not participate in rehabilitation following her total right hip replacement surgery because her treatment providers would not allow her to do so.

| | |
|---|---|
| Q. | Following the replacement of your hip, did you participate in rehabilitation? |
| A. | No. |

See Exhibit 22 at p. 177, lns. 16-18.  Plaintiff testified that she was prohibited from doing so because her treatment providers did not want her to reinjure her hip.

| | |
|---|---|
| Q. | Why not? |
| A. | They wouldn't let me. |
| Q. | Are you stating that the medical providers would not let you participate in rehab? |
| A. | That's what I'm stating, yes. |

Q.      Why would they not let you do rehab?

. . .

A.      I was already on the second surgery.  They didn't want me to do anything.

. . .

THE WITNESS:  The physician told me it was messed up, my hip was totally messed up.  And they didn't want me to take a chance of taking therapy and knocking it back out.

Id. at pp. 177-78, lns. 19-15.  When presented with medical records stating that plaintiff refused to participate in physical therapy against medical advice, plaintiff simply change her testimony to state that she did not need the physical therapy so she refused.  Id. at p. 226, lns. 2-10.

> f.      **To enhance her liability claim, plaintiff committed perjury regarding her weight at the time of the accident.**

An occupant's weight is critical in assessing the amount of damage done to interior components of an automobile caused by an occupant's interaction with those interior components, including the airbag and seat belts.  In order to hinder HMA's defenses and bolster her claims, plaintiff committed perjury regarding her weight at the time of the accident in order to mitigate the amount of damage that would be caused by contact with a 250 pound unrestrained driver with airbag deployment.  According to plaintiff's testimony, she weighed only 180 pounds at the time of the accident.

Q.      How much did you weigh on the day of the accident?

A.      About 180.

Q.      180 pounds?

A.      Yeah.

. . .

Q.      So you're testifying today that you weighed 180 pounds at the time of the subject accident?

A.      Yes.

See Exhibit 1 at pp. 98-99, lns. 21-10.

When presented with medical records prepared following the subject accident showing that plaintiff weighed 250 pounds, see Exhibit 9, plaintiff testified that she might

1 | have regained weight.

2 | Q. I have a medical record that the -- it's Page 7 of Exhibit DD that
3 | indicates that you were 5'7" and 250 pounds on June 5th, 2006.  Do you recall weighing 250 pounds on the day of the accident?

4 | A. No.

5 | Q. Would it be your testimony that that was inaccurate?

6 | A. I couldn't tell you.  I don't remember the weight then; I remember
7 | losing weight.

8 | Q. Do you recall how much you weighed on the day of the accident, Ms. Keyes?

9 | A. I might have been back up to gaining a few pounds.  The last time I
10 | weighed –

See Exhibit 22 at pp. 218-19, lns. 24-12.

11 | When asked her weight in April 2006, just two months prior to the accident, plaintiff
12 | again testified that she weighed 180 to 190 pounds.

13 | Q. Do you recall what you weighed in April of 2006, Ms. Keyes?

14 | A. I was between 180 and 190.

15 | Q. 180 and 190 pounds?

16 | A. Uh-huh.

17 | Id. at p. 219, lns. 19-23.  When presented with medical records prepared in April 2006
18 | showing she weighed 250 pounds, see Exhibit 42, plaintiff testified that she could not state
19 | what her weight was.

20 | Q. Looking at Exhibit CC, Ms. Keyes, Page 3 of Exhibit CC, this report
21 | was again made involving your April 4th, 2006 treatment at UMC, two months prior to the accident.  It indicates that you weighed 250
22 | pounds.  Do you recall any reason to dispute that, Ms. Keyes?

23 | A. I -- I couldn't tell you.  I still couldn't tell you the weight.

24 | See Exhibit 22 at p. 220, lns. 16-22.  Plaintiff's weight is relevant to plaintiff's claims and
25 | HMA's defenses in this matter, and plaintiff's perjury was designed to hinder HMA's
26 | defenses while enhancing her case.

27 | / / /

28 | / / /

### g.     To enhance her damages claim, plaintiff committed perjury regarding pre-accident illicit and prescription drug use.

In an effort to conceal preexisting illicit and prescription drug use to support her claim to have become dependent upon prescription pain killers as a result of the accident, plaintiff committed perjury at her deposition.  According to plaintiff, she has not engaged in illicit drug use for over 25 years.

Q.     Have you ever used illegal drugs, Ms. Keyes?

A.     About 25 years ago.

Q.     What drugs were they?

A.     Weed.

Q.     And so for the past 25 years, you have used no illegal drugs?

A.     No.

Q.     Did you ever use cocaine?

A.     Maybe once or twice.  That was, like, 30 years ago.

Q.     That was only once?

A.     Yeah.

Q.     Was that smoked or snorted?

A.     Smoked.

See Exhibit 1 at p. 85, lns. 9-22.  When asked about pre-accident prescription narcotics use, plaintiff testified that she had not used any since living in the State of Nevada.  See Exhibit 22 at p. 204, lns. 12-24.

Although plaintiff denied recent pre-accident illicit and prescription narcotics use, medical records produced from information provided by plaintiff to medical providers following the accident and pre-accident medical records obtained by HMA tell a different story.  Medical records prepared on the day of the accident or shortly thereafter show that plaintiff used marijuana, crack cocaine, and snorted cocaine.  See UMC Post-Accident Records, Exhibit 51.  Pre-accident medical records show that plaintiff was treated for pain with Hydrocodon, see Exhibit 28 at p. 2; Vicodin, see Exhibit 32 at p. 3; Lortab, see Exhibit

1  32 at p. 1; Exhibit 41 at p. 2; and, just two months prior to her accident, with Oxicodone,

2  see Exhibit 52.

3      As with plaintiff's pre-accident medical history, HMA believes that plaintiff has a far

4  more extensive pre-accident history of prescription narcotic and pain killer use than plaintiff

5  has saw fit to disclose.

6              ***h.      To enhance her damages claim, plaintiff attempted to
                         conceal and committed perjury about her past litigation
7                        history involving personal injury lawsuits.***

8      In an effort to conceal previous personal injuries, plaintiff lied in sworn interrogatory

9  responses and at her deposition regarding prior litigation.  In response to Interrogatory

10  No.16 of HMA's First Set of Interrogatories, plaintiff stated that she settled a claim arising

11  from an automobile accident that was for property damage only.  See Exhibit 19 at

12  Interrogatory No. 16.  Plaintiff also identified a slip and fall claim involving a laundromat

13  where she hurt her neck.  Id.  According to plaintiff, neither of these matters went to

14  litigation. Id.

15      At her deposition, plaintiff testified that she had never been a party to civil litigation.

16      Q.      And have you ever been a party to civil litigation –

17      A.      No.

18      Q.      -- prior to this lawsuit?

19      A.      No.

20  See Exhibit 1 at p. 7, lns. 3-7.  Plaintiff specifically testified that she had never been a plaintiff

21  prior to this lawsuit.

22      Q.      Never been a plaintiff in a lawsuit other than Keyes v. Hyundai?

23      A.      No.

24  Id. at p. 7, lns. 16-18.

25      When presented with a complaint filed by plaintiff for personal injuries related to a

26  slip and fall incident, see Food 4 Less Complaint, Exhibit 53, plaintiff testified only that she

27  did not recall.  See Exhibit 22 at p. 241, lns. 15-18.  As shown in the complaint, the matter

28  involved injuries to plaintiff's "neck and back, which pain radiates down her legs."  See

Exhibit 53 at p. 4.  At present, HMA is unaware if the Laundromat slip and fall identified by plaintiff in interrogatory responses is the same slip and fall incident that is the subject of plaintiff's claims against Food 4 Less or if plaintiff has concealed additional claims for personal injury.

When presented with a complaint filed by plaintiff for personal injuries arising from an automobile accident, see Vasquez Complaint, Exhibit 54, plaintiff again could not recall, see Exhibit 22 at p. 241, lns. 21-25.  Although the complaint identifies plaintiff's claim as a personal injury claim, plaintiff denied that she sustained any injuries in the accident.

> Q.   And again, were there any personal injuries as a result of that accident?
>
> A.   No.

See Exhibit 1 at p. 79, lns. 11-13.  When presented with testimony from a deposition plaintiff gave in that matter, see Motion and Excerpts from Plaintiff's Deposition, Exhibit 55 at pp. 6, 7, plaintiff refused to answer questions regarding her claimed personal injuries and then resorted to testifying that she does not remember.

> Q.   Portions of your deposition that were attached to this motion, Ms. Keyes, state that you still have pain in your back.  You can't mop, you can't vacuum.  Do you recall giving this deposition, Ms. Keyes?
>
> A.   No.
>
> Q.   Do you recall having these injuries that prevented you from doing things like mopping or vacuuming?
>
> A.   **I'm not going to answer that.**
>
> Q.   Not going to answer?
>
> A.   No.
>
> Q.   So you're not going to answer whether or not you recall having those injuries?
>
> A.   **I'm not going to answer that period**, because of the way you worded it.  **No, I'm not going to answer it.**

See Exhibit 22 at p. 199, lns 8-22.  Based on the excerpts of plaintiff's deposition testimony available to HMA and her prior litigation history, it is clear that plaintiff sought to conceal

the existence of unrelated lawsuits in which she made claims for personal injuries for which she now seeks relief from HMA.

Because plaintiff has endeavored to stymie HMA's defenses and advance her claims by engaging in substantial discovery fraud and perjury regarding issues central to plaintiff's claims, dismissal with prejudice is warranted.

### 4. Dismissal Is Appropriate Because Plaintiff's Spoliation Resulted In The Irreparable Loss Of Dispositive Evidence.

As discussed above, plaintiff and her agents allowed the crushing of the key piece of evidence in this case – the Hyundai Accent.  See Exhibits 20, 23.  Nothing can replace the evidence and plaintiff's own experts concede that further examination of that evidence is necessary to finalize their opinions.  As opined by Morrison, he is not the "best answer" to render opinions with respect to an alleged defect with the Accent's airbag.  See Exhibit 15. Rather, based on his examination of the evidence he informed plaintiff's counsel that "I believe there **may be a design problem or a failure of a part** for each of these cases and **an engineer familiar with the design of the system may be the best answer**."  Id. Morrison's opinion that there "may be" a defect does nothing to help plaintiff prove her case. Nor does the fact that plaintiff never retained an engineer "familiar with the design of the airbag" to inspect the Accent and render opinions regarding plaintiff's alleged airbag defects.

Likewise, Rosenbluth conceded in his expert affidavit/report that he cannot validate his preliminary opinions without "further physical examination and testing" of the seat belt. Specifically, he opined that "**[f]urther examination and testing of the seat belt buckle receiver mechanism of a physical and radiographic nature will be necessary to support these preliminary conclusions and opinions**."  See Exhibit 18 at ¶ 10.  As with her airbag defect contentions, plaintiff allowed for the destruction of the only piece of evidence that could support her seat belt defect contentions, leaving any future retained experts and Rosenbluth without necessary evidence to examine other than plaintiff's perjured deposition testimony.

Not only is case dispositive evidence of an airbag and seat belt defect irreparably lost,

but so to is evidence necessary for the parties to evaluate the pre and post-accident condition of the Accent and evidence on the Accent's interior that would demonstrate plaintiff's movement at the time of the accident and what interior components she interacted with during the accident sequence.  All of this evidence is essential to reconstructing the accident determining the forces involved, and ascertaining plaintiff's movement in and interaction with the Accent to establish injury causation.

Because plaintiff and her agents destroyed the only case dispositive evidence in this matter, dismissal with prejudice is warranted.

### 5. Dismissal Is Appropriate Because Plaintiff's Spoliation And Discovery Fraud Prevent A Fair Adjudication Of This Matter On The Merits.

Quite simply, the failure of plaintiff and her agents to preserve the evidence coupled with plaintiff's willful and substantial discovery fraud renders it impossible to adjudicate this case on the merits.  The very piece of evidence, which is the subject of this litigation, is essential to determining whether the airbag and seat belt were defective or functioned properly and to establishing the cause of plaintiff's injuries was destroyed.  Because this dispositive evidence has been destroyed, there is no longer any way for either party to present evidence related to the performance of the Accent during the accident.  Nor is it possible for either party to prove or disprove those interior components plaintiff interacted with during the accident sequence in order to establish the cause of plaintiff's injuries.

Furthermore, honest responses to written discovery and at deposition are essential for a fair adjudication on the merits.  Where a plaintiff willfully conceals evidence regarding issues directly related to liability and her damages and commits perjury at deposition in order to hinder the other party and advance her own claims, it is not possible for a jury to fully consider the merits because it is no longer possible to identify the merits.  Nor is it possible for a non-offending defendant to have the matter fairly adjudicated because discovery fraud prevents the non-offending party from identifying and presenting evidence to the trier of fact.

As the only case dispositive evidence no longer exists and plaintiff engaged in substantial discovery fraud in order to advance her claims, key evidence is forever lost and

there can be no true adjudication of this matter on the merits.  For this reason, dismissal with prejudice is warranted.

### 6. Dismissal Does Not Unfairly Operate To Penalize Plaintiff For The Spoliation Of Her Agents And Her Own Discovery Fraud.

Stubli upheld a dismissal where the plaintiff himself took no part in the specific discovery abuses.  810 P.2d at 789.  Although HMA has obtained no evidence to date that plaintiff herself authorized the spoliation of the Accent, plaintiff's agent, Accident Solutions, was personally involved in willfully declaring the Accent abandoned and having it destroyed. See Exhibit 20, 23.  Because plaintiff had a continuing duty to preserve the evidence, dismissal does not unfairly penalize plaintiff for failing to ensure that her agents retained the Accent on her behalf.  This plaintiff did not do.  Furthermore, plaintiff's discovery fraud compounds the prejudice to HMA in defending this action as plaintiff willfully concealed information relevant to her claims and HMA's defenses and committed perjury at her deposition.  Clearly, plaintiff has endeavored to stymie HMA's defenses while enhancing her claims.  As between plaintiff and HMA, dismissal with prejudice is the only judicious remedy as plaintiff, not HMA, should suffer the consequences of her conduct.

### 7. Dismissal Is The Only Remedy That Will Deter Future Litigants From Engaging In Similar Conduct.

Plaintiff's failure to preserve the Accent and her willful discovery fraud in this product liability action threatens the very integrity of civil proceedings.  Courts, in protecting their integrity and the integrity of the civil justice system, must impose meaningful sanctions to deter parties from such action.  In situations like this, the court defends its integrity and the integrity of the civil justice system, by applying a remedy reasonably calculated to deter other litigants who may take lightly their duty to preserve the only dispositive piece of evidence in the case, as exhibited here by plaintiff and her agents, and to deter future acts of discovery fraud whereby parties perjure themselves in sworn testimony and fail to fully and truthfully respond to discovery, as exhibited here by plaintiff. Indeed, any remedy short of dismissal would likely encourage persons with similar inclinations to plaintiff to try to get away with similar evidence destruction, discovery fraud,

1   and perjury because the potential gain from this wrongful conduct would exceed the
2   downside risk of getting caught.

3          The spoliation of the Accent, discovery fraud, and perjury served to benefit plaintiff's
4   claims while stymieing HMA defenses by preventing HMA from inspecting the Accent's post-
5   accident condition, studying the performance of the airbag and seat belt during the accident,
6   analyzing the interior components of the Accent to ascertain what plaintiff interacted with
7   during the accident sequence, establishing the cause of plaintiff's injuries, and obtaining
8   relevant evidence regarding plaintiff's claims.  Thus, plaintiff benefited as HMA's defenses
9   suffered.

10         In order to deter future litigants from engaging in the aforementioned conduct,
11  dismissal with prejudice is the only appropriate sanction.

12      **C.    SUMMARY JUDGMENT IS APPROPRIATE BECAUSE THE PLAINTIFF HAS DISPOSED
            OF EVIDENCE NECESSARY TO PROVE HER CASE.**
13
14         Federal Rule of Civil Procedure, Rule 56 authorize summary judgment where the
    moving party is entitled to judgment as a matter of law and where there are no genuine
15  issues of fact.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  In fact, dismissal is
16  mandated by Fed. R. Civ. P. 56(c) when "after adequate time for discovery and upon
17  motion, against a party who fails to make a showing sufficient to establish the existence of
18  an element essential to that party's case."  Celotex, 477 U.S. at 322.  The evidence
19  favoring the non-moving party must be sufficient "for a jury to return a verdict for that
20  party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  Where the evidence is
21  "merely colorable or is not significantly probative, summary judgment may be granted."  Id. at
22  249-50 (citations omitted).  For the non-moving party to prevail, there must be more than
23  "[t]he mere existence of a scintilla of evidence in support of plaintiff's position."  Id. at 252.
24  When the party moving for summary judgment has met its burden, the non-moving party
25  "must do more than simply show that there is some metaphysical doubt as to the material
26  facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
27         In a strict products liability action such as this, Nevada has not adopted absolute
28

45

liability for manufacturers when someone is injured while using a product.  Rather, to prevail on her product liability action against HMA, plaintiff must prove: (1) HMA was the manufacturer, designer or distributor of the Accent; (2) that the Accent was defective; (3) that the defect existed when the Accent left the possession of HMA; (4) that the product was used in a manner that was reasonably foreseeable by the defendant; and (5) that the defect was a proximate cause of the damage or injury to plaintiff.  <u>See</u> Nevada Jury Instructions 7.02.  The plaintiff in this case cannot meet her burden of proof because she allowed for the destruction of the one piece of physical evidence required to show that a defect existed and that the alleged defect was the cause of plaintiff's injuries.  Because the Accent also had substantial pre-existing damage, plaintiff also lacks the ability to show that any alleged defect existed when the Accent left HMA's possession.  <u>See</u> <u>supra</u> §§ III(B)(2)(a), (3)(h).

Summary judgment is appropriate even though plaintiff has produced expert reports. Morrison opined that the airbag system in the Accent failed to deploy during the accident and was therefore defective.  <u>See</u> Exhibit 14.  Morrison apparently bases this opinion on information provided to him about a post-accident deployment taking place when plaintiff was extracted from the Accent by emergency responders.  He stated that "[t]he delay deployment of the Keyes Hyundai will most likely be assisted by the emergency personnel at the scene." <u>See</u> Exhibit 15.  Morrison's speculation about emergency responders witnessing a post-accident deployment was not borne out as none of the emergency responders deposed to date identify a post-accident deployment.  <u>See</u> Exhibits 7-8.

Morrison also conceded in his report that he was not the "best answer" to render opinions with respect to an alleged defect with the airbag in the Accent.  <u>Id.</u>  Rather, he informed plaintiff's counsel that "I believe there **may be a design problem or a failure of a part** for each of these cases and **an engineer familiar with the design of the system may be the best answer**."  <u>Id.</u>  Morrison's opinion that there "may be" a defect raises nothing more than a metaphysical doubt upon which plaintiff cannot prevail.  Because plaintiff's expert does not know if there is a defect with the airbag but merely opines there "may be" and plaintiff never retained an expert familiar with the design of the airbag in the Accent prior to

allowing it to be destroyed, future experts retained by plaintiff will not have an opportunity to inspect the Accent's airbag system and will be left with nothing more than speculation, as with Morrison, as to the existence of an airbag defect and whether the alleged defect was the cause of plaintiff's injuries.

As with the airbag, plaintiff allowed for the destruction of the only piece of evidence that could support her seat belt defect contentions, leaving any future retained experts by plaintiff and Rosenbluth with no necessary evidence to examine.  As Rosenbluth conceded in his expert affidavit/report, he cannot validate his preliminary opinions without further physical examination and testing of the seat belt.

Specifically, he opined that "**[f]urther examination and testing of the seat belt buckle receiver mechanism of a physical and radiographic nature will be necessary to support these preliminary conclusions and opinions**."  Id. at ¶ 10.  Rosenbluth's un-validated preliminary opinions are nothing more than a scintilla of evidence raising only a metaphysical doubt.

Because Rosenbluth opinioned that he cannot validate his own "**preliminary conclusions and opinions**" absent additional "physical and radiographic" examinations and testing of the seat belt, plaintiff cannot now demonstrate that the seat belt in the Accent was defective or that the alleged defect was the cause of plaintiff's injuries because plaintiff allowed for the irreparable destruction of that necessary physical evidence.   As with Rosenbluth, any future experts retained by plaintiff will not have an opportunity to inspect the Accent's seat belt and will be left with nothing more than speculation as to the existence of a seat belt defect and whether the alleged defect was the cause of plaintiff's injuries.

As plaintiff is without the ability to prove her claims regarding alleged defects in the airbag and seat belt of the Accent because plaintiff and her agents spoliated the only case dispositive physical evidence, there is no evidence to support plaintiff's defect contentions aside from plaintiff's perjured testimony, see supra § III(B)(3), leaving plaintiff with nothing more than a metaphysical doubt.  This is not sufficient to meet plaintiff's burden of proof and, therefore, HMA is entitled to summary judgment in its favor.

1

## IV.    CONCLUSION

2        For the foregoing reasons, this Court should dismiss plaintiff's Amended Complaint

3  in its entirety and with prejudice for evidence spoliation and discovery fraud.    In the

4  alternative, this Court should grant HMA's Motion for Summary Judgment pursuant to Fed.

5  R. Civ. P. 56.

6        DATED this 6th day of May, 2009.

7                                           **BOWMAN AND BROOKE LLP**

8
        By:    /s/ Bryan J. Blehm
9            Paul G. Cereghini (Nevada Bar No. 010000)
             Bryan Blehm (Nevada Bar No. 009975)
10           2901 North Central Avenue, Ste. 1600
             Phoenix, Arizona  85012
11           paul.cereghini@bowmanandbrooke.com
             bryan.blehm@bowmanandbrooke.com
12
             In conjunction with:
13
             Greg W. Marsh (Nevada Bar No. 000322)
14           **LAW OFFICES OF GREG W. MARSH**
             731 South Seventh Street
15           Las Vegas, Nevada  89101
             (702) 387-0052
16           Dmr4253@aol.com

17           Attorneys for Defendant Hyundai Motor America

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AFFIRMATION**

**Pursuant to Fed. R. Civ. P. 5.2**

The undersigned does hereby affirm that social security numbers, tax payer identification numbers, account numbers, and dates of birth have been redacted from the preceding **MOTION TO DISMISS FOR SPOLIATION OF EVIDENCE AND DISCOVERY FRAUD AND FOR SUMMARY JUDGMENT** and attached Exhibits pursuant to Fed. R. Civ. P. 5.2.

DATED this 6th day of May, 2009.

**BOWMAN AND BROOKE LLP**

By:___ /s/ Bryan J. Blehm_____
Paul G. Cereghini (Nevada Bar No. 010000)
Bryan Blehm (Nevada Bar No. 009975)
2901 North Central Avenue, Ste. 1600
Phoenix, Arizona  85012
paul.cereghini@bowmanandbrooke.com
bryan.blehm@bowmanandbrooke.com

In conjunction with:

Greg W. Marsh (Nevada Bar No. 000322)
**LAW OFFICES OF GREG W. MARSH**
731 South Seventh Street
Las Vegas, Nevada  89101
(702) 387-0052
Dmr4253@aol.com

Attorneys for Defendant Hyundai Motor America

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of May, 2009, I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF Registrants:

G. Dallas Horton, Esq.
David L. Thomas, Esq.
Monte Hall, Esq.
G. DALLAS HORTON & ASSOCIATES
4435 South Eastern Avenue
Las Vegas, Nevada  89119
gdallashorton@lvcm.com

Robert D. Vannah, Esq.
VANNAH & VANNAH
400 South Fourth Street, 6th Floor
Las Vegas, NV 89101
tucker@vannah.net

Greg W. Marsh, Esq.
LAW OFFICES OF GREG W. MARSH
731 South Seventh Street
Las Vegas, NV 89101
gwm4253@aol.com


       /s/ Alice Murphy
Employee of Bowman and Brooke LLP